PALO ALTO TOWN & COUNTRY VILLAGE, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Palo Alto Town & Country Village, Inc. v. Commissioner
Docket Nos. 5947-70, 5948-70, 5949-70.
United States Tax Court
T.C. Memo 1973-223; 1973 Tax Ct. Memo LEXIS 63; 32 T.C.M. (CCH) 1048; T.C.M. (RIA) 73223; October 10, 1973, Filed *63 Held: 1. The separate cost of the two tracts of land purchased by Ronald and Ann Williams in 1959 determines the basis of the parcel he sold from one of these tracts during the taxable year 1963. 2. Ronald Williams and Palo Alto Town & Country Village, Inc. have not established by a preponderance of the evidence that they are entitled to any amount with respect to the cost of operating a chartered airplane on a 24-hour standby basis in addition to the $125 per hour for actual flying time allowed by respondent during the taxable years involved. 2 3. Respondent properly allocated the income realized from the sale of certain timber to the Samuel R. Neider Trust from Commander Aviation, Inc., to Town & Country Construction Company, Inc., both controlled by the same interests, and determined a deficiency for the taxable year 1965 against the latter in the amount of $15,245.96 under section 482 of the 1954 Code. 4. Ronald Williams and Palo Alto Town & Country Village, Inc. failed to prove that they are entitled to travel, entertainment, and promotional expenses in excess of the amounts allowed by respondent for the taxable period involved. Held further, that a portion of such expenses *64 claimed by Palo Alto and disallowed by respondent constitute a constructive dividend to Williams, taxable as income to him during the years when the payments were made or incurred by Palo Alto. Julian N. Stern, for the petitioners. Edward B. Simpson and William E. Saul, for the respondent. WITHEY
MEMORANDUM FINDINGS OF FACT AND OPINION WITHEY, Judge: For petitioner Palo Alto Town & Country Village, Inc., in docket No. 5947-70, the respondent has determined deficiencies in income taxes as follows: Taxable year ended April 30
Deficiency
1963
$ 58,053.27
1964
60,680.88
1965
52,332.15
1966
46,977.77
1967
43,985.18
1968
40,627.57 3 For petitioner Town & Country Construction Company, Inc., docket No. 5948-70, the respondent has determined a deficiency in income taxes as follows: Taxable year ended March 31
$0
1965
$15,245.96
For petitioners Ronald H. and Ann G. Williams in docket No. 5949-70, the respondent has determined the following deficiencies in income taxes: Taxable year ended December 31
$0
1963
$12,821.15
1964
10,692.65
1965
10,472.01
1966
5,613.26
1967
3,661.42
Certain concessions having been made, the issues remaining for our consideration are: (1) whether Ronald H. Williams is entitled to include the *65 cost of 9.0497 acres of land which was purchased at the same time he purchased 42.313 acres in determining the basis of 5.03948 acres that he sold from the 42.313-acre parcel in the taxable year 1963; (2) whether Ronald H. Williams and Palo Alto Town & Country Village, Inc., are entitled to deduct the expense of having an airplane on a 24-hour standby basis in addition to the $125 per hour for flying 4 time allowed by the respondent; (3) whether the income from the sale of timber is properly allocable to the Town & Country Construction Co., Inc., rather than Commander Aviation, Inc. under section 482 of the Code of 1954; and (4) whether Palo Alto Town & Country Village, Inc., and Ronald H. Williams may deduct travel, entertainment and promotional expenses in excess of the amounts allowed by respondent. GENERAL FINDINGS OF FACT Ronald H. and Ann G. Williams are husband and wife. At the time of their filing of the petition in this case they resided in Palo Alto, California. Ronald H. Williams, hereinafter sometimes referred to as Williams, and Ann G. Williams filed joint Federal income tax returns for the calendar years 1963 through 1967 with the district director of internal revenue, *66 San Francisco, California. Williams was president of Palo Alto Town & Country Village, Inc., hereinafter referred to sometimes as Palo Alto. At the time of filing of the petition in this case, Palo Alto was a California corporation with its principal place of business in California. For all periods of time material herein, the stock of Palo Alto was entirely owned by Williams and his wife. 5 Palo Alto filed Federal corporate tax returns for the fiscal years ended April 30, 1963 through April 30, 1968, with the district director of internal revenue, San Francisco. Issue 1. Cost Basis of Acreage Sold in 1963. FINDINGS OF FACT In 1959 Williams and his wife purchased approximately 50 acres of land in San Jose, California, consisting of a 42.313-acre parcel and a 9.0497-acre parcel. The following facts relate to this transaction: Prior to January 27, 1956, Dr. Thomas L. Blanchard (Blanchard) entered into an agreement to sell to each of James C. Smyth (Smyth) and James W. Harvey (Harvey) an undivided one-half interest in 42.313 acres of real property located in San Jose, California. The purchase price was $400,000, payable $50,000 in cash and $350,000 by promissory note secured *67 by a deed of trust. A deed transferring undivided one-half interests in the property into the names of Smyth and Harvey was executed by Blanchard on January 27, 1956. The consideration for the one-half interests in the property acquired in Smyth's and Harvey's names was furnished by John A Cussen, Jr., hereinafter sometimes called Cussen. 6 In February 1959, Williams agreed to pay Smyth $50,000 ($5,000 cash and a $45,000 promissory note) and Harvey $15,000 ($10,000 cash and a $5,000 promissory note) and agreed to indemnify Harvey for any liability on the promissory note, secured by the deed of trust to Blanchard. In return for this agreement, Harvey agreed to convey his undivided one-half interest in the property to Williams and Smyth agreed to convey his undivided one-half interest in the property to the Crocker-Anglo National Bank. Pursuant to this agreement, Smyth and Harvey conveyed an undivided one-half interest to Williams and an undivided one-half interest to the Crocker-Anglo National Bank. Williams also executed an indemnity agreement whereby he agreed to indemnify Harvey against any liability that he might have with respect to the $45,000 promissory note, but assumed *68 no personal liability on the note. Smyth and Harvey executed a deed to Williams on February 11, 1959, granting him an undivided one-half interest in the 42.313 acres. Smyth and Harvey also executed a deed to the Crocker-Anglo National Bank conveying an undivided one-half interest in the 42.313 acres. 7 On May 8, 1959, an "Agreement of Purchase" was entered into by Palo Alto, First Cupertino Corporation, Crocker-Anglo National Bank, Williams and his wife, and John A Cussen, Jr. Palo Alto, referred to in the agreement as "buyer" was only the nominee of Williams and his wife; and they were, in fact, the purchasers. [2] The agreement designated a 9.0497-acre parcel, adjacent to the 42.313 acres, as the "first parcel" and designated the undivided one-half interest in the 42.313 acres previously transferred to the Crocker-Anglo National Bank as the "second parcel." Pursuant to the agreement of purchase, Williams paid the Crocker-Anglo National Bank $200,000 ($60,000 cash and $140,000 in installments) for the undivided one-half interest in the 42.313 acres; *69 and the bank conveyed its one-half interest in the 42.313 acres, subject to the $350,00 encumbrance, to Williams. It was a condition of the transaction that it be consummated with respect to both parcels or neither. Also, on or about May 8, 1959, Crocker-Anglo National 8 Bank executed a deed to Palo Alto (the Williamses' nominee) for the undivided one-half interest in the 42.313 acres held by it as trustee for the benefit of Cussen's son. The First Cupertino Corporation executed a deed to Palo Alto for the 9.0497-acre parcel on or about May 8, 1959, for $400,000 ($40,000 cash and $360,000 in installments). In 1963, the Williamses sold 5.03948 (hereinafter referred to as 5.04) acres located in the southeast corner of the second parcel (42.313 acres). By the time of the sale the area of the second parcel had diminished through street widening to 41.782 acres. Williams computed the basis for determining gain on the 1963 sale by aggregating the cost of the first and second parcels of land, with other costs, to determine a basis of $20,166.05 per acre and then computing the cost of the 5.04 acres sold as a total of $101,626.15 plus expenses of the sale. On their return for 1963, *70 Williams and his wife reported a cost basis of $20,166.05 per acre or a total of $101,626.15 for 5.04 acres of land that they sold. The respondent determined the cost basis for the 1963 9 sale by calculating the cost of one acre of the 42.313 acres on a pro rata distribution of the cost of the 42.313 acres. The respondent determined the cost of one acre was $14,377.66 and that the total cost of the 5.04 acres sold in 1963 was $72,455.94 plus additional expenses of sale. [3]
OPINION In 1963 Williams sold approximately 5.04 acres from the 42.313 acres which he owned and figured the cost basis of the property sold for income tax purposes by computing the per acre cost of the 42.313 and 9.0497-acre parcels together as a single unified purchase and allocated the total purchase price over the entire acreage. Respondent, on the other hand, has calculated the cost basis of the 5.04 acres by computing its per acre cost of the purchase *71 price of the 42.313 acre-parcel ($615,000) plus the costs incident to the separate acquisition of the 42.313-acre parcel. Petitioner contends that the bargained for consideration for the 10 undivided one-half interest in the 42.313-acre parcel was actually $400,000 and not $200,000 because the consideration for this parcel ("second parcel") was inadvertently set forth in the 1959 purchase agreement at the lower amount and that the $200,000 figure should have been the consideration with respect to the 9.0497-acre parcel ("first parcel"). It is petitioner's position that before he knew the true identity of the record owners of all the 51 acres purchased in May 1959 he bargained with its ostensible owner, John A. Cussen, Jr., for the entire property at a value of $20,000 per acre. In the same vein, petitioner argues that the so-called "first parcel" and "second parcel" referred to in the May 8, 1959 agreement were in fact part of one integrated transaction, and that he actually paid an additional $200,000 for the 42.313-acre parcel over what the respondent maintains he paid. Section 1001 of the Code of 1954 provides that the gain from the sale of property shall be the amount that the *72 selling price exceeds the cost of the property. See sections 1011 and 1012. The burden is upon the taxpayer to establish the cost of the property. O'Neill v. Commissioner, 271 F.2d 44 (C.A. 9, 1959); Moore v. Commissioner, 425 F.2d 713 (C.A. 9, 1970). 11 It is well established that the cost of each tract determines the basis for the parcel sold from that tract. In H. F. Bovard, 15 B.T.A. 546 (1929) the taxpayer had purchased separate tracts of land in 1905, 1906 and 1907, and when the taxpayer sold parcels from the tracts he purchased in 1906 and 1907, he determined the basis of the parcels he sold by averaging the cost of all three tracts of land. The Board of Tax Appeals held that the cost of each tract sold determined the basis for the parcel sold from that tract. Likewise, we hold that the cost of the 42.313-acre parcel bought by Williams in 1959 determines the basis for the land sold therefrom by him in 1963. Strong proof is required to overcome the consideration stated in an agreement reached through arm's-length bargaining. [4]Estate of Rogers v. Commissioner, 445 F.2d 1020 (C.A. 2, 1971), affirming a Memorandum Opinion of this Court (1970). We find nothing here to 12 *73 justify allowing petitioner to remake the agreement to establish a present tax advantage. Petitioner's selfserving statements are inadequate to impeach the clear terms of the contract, and he has not produced the "strong proof" necessary to vary its terms. In view of the foregoing, we sustain respondent on this issue. Issue 2. Airplane Expenses. FINDINGS OF FACT Commander Aviation, Inc., hereinafter sometimes called Commander, is a California corporation with its principal place of business in California. After January 31, 1963, the outstanding stock of Commander was owned 30 percent by Williams, 35 percent by James A. Williams (Williams' son) and 35 percent by R. C. Wison (Williams' son-in-law). Commander owned one airplane which was for lease and during the taxable years involved herein, Palo Alto and Williams rented it for business and personal use. On some *74 occasions Williams used the airplane to entertain guests. Commander kept no records of the number of flights and the purpose of each flight. Records were kept showing the number of hours each year that the airplane 13 was used by Palo Alto Town & Country Village, Inc. and by Williams in his individual business ventures. The costs attributable to operation of the airplane were apportioned among Palo Alto and the different businesses Williams operated as sole proprietorships on this basis. The common and prevailing rate in and about California during the years involved for which a plane of the same general class as owned by Commander could be rented for each flying hour of use with a pilot was $125 per tachometer hour. However, such rate does not include standby time when the plane is on the ground, nor does it take into consideration the fact that a charter airplane will usually return empty to its home base at the expense of the chartering party rather than wait on the ground for more than several hours. In such circumstances, to be picked up and returned home requires the chartering party to pay for another complete round trip. Use of the airplane by Palo Alto during the years *75 involved was instrumental in obtaining a number of tenants at the shopping centers it owned and operated. The private airplane permitted Williams, and other employees, to visit several different cities in one day for this purpose and return home, as well as permitting 14 prospective tenants to visit the shopping centers and return to their place of business in a minimum amount of time. Palo Alto also used the airplane to fly prospective tenants over the area surrounding its shopping centers so that they might see the population density and the traffic flow. Palo Alto used the airplane to investigate population densities and traffic patterns in areas surrounding land that it had under consideration for shopping centers. On at least one occasion, Palo Alto received a substantial fee ($5,000) for a two-day air survey of the potential use of land that it made for another party. Among the business uses of the airplane made by Williams was travel between his headquarters in Palo Alto and sole proprietorships he operated and business interests he had in Red Bluff, Redding, Corning, Sacramento, Palm Desert, and Santa Barbara, California. Respondent disallowed the airplane expenses claimed *76 by Williams for the calendar years 1963, 1964 and 1965, and allowed airplane expenses at the rate of $125 per hour for the actual tachometer hours of use as follows: 15 $0
$0
1963
Total Airplane Expenses
$15,911.77
Total airplane expenses allowed at $125 per hour for 55 hours
6,875.00
Total airplane expenses disallowed
9,036.77
1964
Total airplane Expenses
19,385.54
Total airplane expenses allowed at $125 per hour for 44 hours
5,500.00
Total airplane expenses disallowed
13,885.54
1965
Total Airplane Expenses
16,999.92
Total airplane expenses allowed at $125 per hour for 52 hours
6,500.00
Total airplane expenses disallowed
10,499.92
The respondent disallowed airplane expenses claimed by Palo Alto for the fiscal years ending April 30, 1963 through April 30, 1968 and allowed Palo Alto airplane expenses at the rate of $125 per hour for the actual tachometer hours used as follows: Fiscal Year Ending
Amount 4-30-63
Total Airplane Expenses
$5,847.07
Total airplane expenses allowed at $125 per hour for 43 hours
5,375.00
Total airplane expenses disallowed
472.07
4-30-64
Total Airplane Expenses
14,483.63
Total airplane expenses allowed at $125 per hour for 47 hours
5,875.00
Total airplane expenses disallowed
8,608.63
4-30-65
Total Airplane Expenses
14,016.56
Total airplane expenses allowed at $125 per hour for 58 hours
7,250.00
Total airplane expenses disallowed
6,766.56
4-30-66
Total Airplane Expenses
19,763.77
Total airplane expenses allowed at $125 per hour for 59 hours
7,375.00
Total airplane expenses disallowed
12,388.77
4-30-67
Total Airplane Expenses
15,100.47
Total airplane expenses allowed at $125 per hour for 40.5 hours
5,062.50
Total airplane expenses disallowed
10,037.97
4-30-68
Total Airplane Expenses
7,850.00
Total airplane expenses allowed at $125 per hour for 29.1 hours
3,637.50
Total airplane expenses disallowed
4,212.50
OPINION *77 Williams and Palo Alto Town & Country Village, Inc. (hereinafter sometimes called petitioners) contend that the amounts disallowed by the respondent with respect to the cost of operating the chartered airplane on a 24-hour standby basis (in addition to the $125 per hour for actual flying time allowed by respondent), constituted ordinary and necessary 17 expenses of its business, and, hence, are deductible under section 162 of the 1954 Code. Respondent, in opposition, maintains that Williams and Palo Alto have failed to establish that having an airplane on a standby basis was an ordinary and necessary expense of their business. Respondent has allowed the petitioners the agreed upon cost of the airplane for the actual flying time claimed. The cost was computed by allowing the petitioners the tachometer hours shown on the aircraft at the rate of $125 per hour, the stipulated per hour rental cost of an airplane of a similar type in California. Initially, we are cognizant that private airplanes are commonly used in conducting business. However, inherent in the concept of ordinary and necessary expenses incurred in the operation of a trade or business is the requirement that the expenditure *78 be reasonable in amount in relation to its purpose. United States v. Haskel Engineering & Supply Company, 380 F.2d 786 (C.A. 9, 1967); Commissioner v. Lincoln Electric Co., 176 F.2d 815, 817 (C.A. 6, 1949), certiorari denied 338 U.S. 949 (1950). Respondent does not dispute the business use of the airplane involved; however, he avers that any expenses in excess of $125 per hour for actual flying time were not 18 ordinary and necessary within the meaning of section 162, supra, because they exceeded "the prevailing rate in the locality for which a plane with a pilot could be chartered." Williams urges that there were two principal reasons for petitioners chartering a plane full time (rather than renting one from an unrelated air charter service at standard rates in the area); first, availability of the aircraft when its use is desired; and the second is safety. As to the safety factor, Williams' testimony that chartered planes are generally unsafe has no affirmative support in the record, which indicates only that one must be careful in selecting a chartered aircraft service to ascertain that the airplane does meet certain safety standards. Since Williams controlled Commander, petitioners *79 apparently knew the safety requirements of the aircraft and the competence of the pilot. However, petitioners' selection of Commander as the Company from whom they wanted to charter an airplane does not demonstrate that an unrelated air charter service in the area was not equally in compliance with the safety requirements, and did not also have all-weather equipment. Moreover, Williams' testimony that they needed an airplane ready to fly at any moment appears to be inconsistent with the business they conducted. The record shows only 19 three instances where having the airplane on standby call was a convenience. We are convinced that the petitioners did not use the airplane with sufficient frequency to justify the expense of maintaining it on a permanent standby basis as ordinary or necessary for the conduct of petitioners' business. We find for respondent on this issue. Issue 3. Sale of Timber. FINDINGS OF FACT At the time of the filing of the petition in the instant case, Town & Country Construction Co., Inc., hereinafter sometimes referred to as Town & Country, was a California corporation doing business as Williams Construction Company with its principal place of business *80 in California. For all periods of time material herein, the outstanding stock of Town & Country was owned 30 percent by Williams, 40 percent by James A. Williams (Williams' son) and 10 percent by R. C. Ashlock. Town & Country filed a Federal corporate income tax return for the fiscal year ending March 31, 1965, with the district director of internal revenue, San Francisco, California. Prior to 1964, Town & Country had constructed shopping center complexes using large timbers as part of a "rustic" architectural scheme. This timber had a unique 20 quality due to its being air dried which made it particularly valuable for use as exterior trim. In April 1964, Town & Country entered into a contract with the trustees of the Samuel R. Neider Trust for the construction of a shopping center complex in Strawberry, California. The contract provided that Town & Country was to be paid for the performance of the contract, its costs, plus a fee of 10 percent of such costs. The definition of costs provided, inter alia, that "they shall be the actual net cost to the contractor of…materials, supplies," etc. Commander Aviation, Inc., is a California corporation, and its principal place of business *81 is California. Prior to January 31, 1963, its outstanding stock was owned 50 percent by Williams and 50 percent by Joseph S. Lodato. Subsequent to January 31, 1963, the outstanding stock in Commander was owned 30 percent by Williams, 35 percent by James A. Williams (Williams' son), and 35 percent by R. C. Wilson (Williams' son-in-law). Commander and Town & Country were both controlled by the same interests since Williams and his son, James A. Williams, owned 70 percent of the stock in Town & Country and 65 percent of the stock in Commander. 21 Between September 1964 and August 1965, Commander purchased timbers from Town & Country and its suppliers for $17,818.85 and resold them to Town & Country for $47,767.84. Of the $17,818.85 the amount of $12,552.90 was paid directly to Town & Country. Commander received invoices for the timber involved herein and made payments thereon as follows: Invoice Date
Payee
$0
10-08-64
Williams Construction Co.
$10,000.00
3-05-65
Johnson Structures
919.72
3-09-65
Ross-Dove Co.
502.42
3-19-65
Johnson Structures
626.20
3-24-65
M. F. Malvich
1,229.91
3-24-65
Williams Construction Co.
2,092.34
3-12-65
M. F. Malvich
1,098.24
8-24-65
Williams Construction Co.
460.56
(Freight Expense)
889.46$0
Total
$17,818.85$0
*82 Commander sent invoices to Town & Country for the same timber represented by the above invoices, which Town & Country then duly paid as follows: 22 Invoice Date
$0
9-18-64
$ 30,270.56
12-22-64
8,198.64
3-22-65
4,235.86
3-25-65
1,874.28
3-25-65
2,575.20
3-25-65
613.30$0
Total
$41,767.84$0
The timbers involved were transferred directly from the foregoing payees to the job site in Strawberry, California where Town & Country was building a shopping center. On September 18, 1964, Town & Country in turn billed the Neider Trust for whom it was building the Strawberry Shopping Center for $30,270.56, representing part of the timber for which Commander had billed Town & Country. By March 31, 1965, Town & Country billed the Neider Trust for an additional $17,497.29, representing the balance of the timber which Commander had billed to Town & Country. During Town & Country's fiscal year ending March 31, 1965, the Neider Trust had paid Town & Country, pursuant to the April 28, 1964 contract, the sum of $47,767.84 for the timber involved herein. 23 Town & Country had previously acquired similar timbers from Johnson Structures, Ross-Dove Co. and M. F. Malvich in constructing shopping centers in Palo Alto and *83 San Jose, California. Town & Country did not report any gain or loss in the fiscal year ending March 31, 1965 for the $47,767.84 received from the Neider Trust. Commander filed Federal corporate income tax returns for the fiscal years ending August 31, 1962 through August 31, 1968, with the district director of internal revenue, San Francisco, California. The only income Commander had for the fiscal years ending August 31, 1962 through August 31, 1968, aside from the sale of timber in the fiscal year ending August 31, 1965, was income from leasing aircraft. Commander had no net income for any of these years except for the fiscal year ending August 31, 1965. For the years 1961 through the fiscal year ending August 31, 1968, 1961 was the only year Commander had a net operating loss in the amount of $11,987.82. Commander included the $47,767.84 received from Town & Country in its gross income for the fiscal year ending August 31, 1965, and deducted as the cost of goods sold $17,818.85 representing the amounts paid to Town & Country. 24 Commander then deducted the net operating loss carryover from 1961 of $11,987.82 from the income realized from the sale of the timber to Town & *84 Country on its tax return for the fiscal year ending August 31, 1965. Respondent, in his notice of deficiency in docket No. 5948-70, determined a deficiency against Town & Country in the amount of $15,245.96 for the fiscal year ending March 31, 1965, and in explaining the adjustment stated that Commander, a corporation owned or controlled by Town & Country, improperly reported as part of its gross income the amount of $30,795.65, which amount was earned by Town & Country in the taxable year ending March 31, 1965, in the conduct of its construction business; and under the authority of sections 61 and 482 of the 1954 Code, the latter's taxable income was increased in the amount of $30,795.65. OPINION The respondent reallocated the income realized from the sale of the timber to the Neider Trust from Commander to Town & Country and determined a deficiency for the taxable year 1965 against Town & Country in the amount of 25 $15,245.96 under section 482 of the 1954 Code. [5] It is respondent's position that Commander, a corporation owned or controlled by the stockholders of Town & Country, improperly reported $29,948.99, which amount was actually earned by Town & Country in the taxable year *85 ended March 31, 1965, in the conduct of its construction business, and hence its income should be increased in the amount of $29,948.99. [6] Petitioner contends that respondent was not justified in shifting the amount in question from Commander to Town & Country on the ground that section 482, supra, only 26 applies to the sale of tangible property between controlled corporations when the sale is "at other than an arm's length price." Section 1.482-2(e) (1), Income Tax Regs. Petitioner maintains that the price paid by Town & Country to Commander was a fair price; that not only was Town & Country reimbursed for the cost of the timbers (plus an additional 10 percent) when it applied them to a construction contract, but the price was that prevailing in the market place and was approved by the architects for the other party to the construction contract. In the same vein petitioner urges that the timbers that Commander sold to Town & Country were, for the most part, those in which Commander had acquired an interest in 1962 for services rendered in locating them with its airplane and for which Commander had intended uses; that the balance of the timbers were those that Commander bought in *86 1965; and that Commander was entitled to a reasonable profit from the resale of the timbers. Section 482 authorizes in any case where two businesses are controlled directly or indirectly by the same interest an allocation of gross income and deductions between them if it is determined that this is 27 necessary to prevent tax evasion or clearly to reflect the income of either business. *87 The purpose of this provision "is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer." Section 1.482-1(b), Income Tax Regs. The legislative history of section 482 indicates that it was "designed to prevent the avoidance of tax or the distortion of income by the shifting of profits from one business to another." Rooney v. United States, 305 F.2d 681, 683 (C.A. 9, 1962). We believe that Town & Country has failed to establish that the respondent abused his discretion in allocating income from the sale of timber in question to the Neider Trust from Commander to Town & Country under section 482, supra. The record shows that Town & Country had previously built several shopping centers using old timbers to create a rustic atmosphere for the complexes. In 1964, Town & Country entered into a contract with the Neider Trust to build another of these shopping centers in Strawberry, California. At that time Town & Country already had a 28 number of timbers in its inventory and apparently had access to suppliers who *88 had provided similar timber used in the other shopping centers. Between September 1964 and August 1965, Commander purchased timbers from Town & Country and its suppliers for $17,818.85 and resold them to Town & Country for $47,767.84. Town & Country then used the timbers in the construction of the shopping center and billed the Neider Trust in accordance with its contract for the cost of the timber, that is, $47,767.84. All of this timber had been delivered by the suppliers to either Town & Country for the construction site in Strawberry so that as far as Commander was concerned this was a paper transaction. Commander and Town & Country were both controlled by the same interests since Williams and his son, James A. Williams, owned 70 percent of the stock in Town & Country and 65 percent of the stock in Commander. We find that Williams was in "control" of both companies. Sec. 1.482-1(a) (3), Income Tax Regs.
In our view, Commander, whose sole business was leasing an airplane, would not have purchased and sold timber to Town & Country on this one occasion but for the fact that they were both controlled by the same 29 interests. There could be no other plausible reason for Town *89 & Country to sell timber it knew it was going to use and then buy it back other than to take advantage of the net operating loss carryover of $11,987.82 that Commander had on its books. Respondent's allocation more clearly reflects the income of the two corporations since Town & Country had already owned 70 percent of the timber sold to Commander and Town & Country had established the sources of supply of the timber. It is well recognized that respondent's allocation under section 482, supra, will not be altered by the courts unless the taxpayer can show that the respondent acted arbitrarily. Charles Town, Incorporated v. Commissioner, 372 F.2d 415 (C.A. 4, 1967), affirming a Memorandum Opinion of this Court; Rooney v. United States, supra. No convincing evidence was adduced by Town & Country to show that respondent has made an improper allocation of the income in question under the statute. Accordingly, we hold for respondent on this issue. Issue 4. Travel, Entertainment and Promotional Expenses. FINDINGS OF FACT During the years from May 1, 1962 through April 30, 1968, Williams was president of Palo Alto Town & Country Village, Inc. During this period he made cash expenditures *90 30 for travel and entertainment. A portion of the entertainment expenditures involved cash payments for lunches and dinners paid by Williams during lease negotiations with prospective tenants. Most of the leasing work for Palo Alto was done by him. During the above period he negotiated to fruition numerous leases, had serious negotiations with many prospective tenants, and less serious conferences with many other prospective tenants. During this period, Williams also entertained at lunches and dinners people in the banking and lending institutions with whom Palo Alto was negotiating financing for its shopping center developments. He also entertained at lunches and dinners individuals involved in other shopping centers where exchange of information was helpful to Palo Alto. Williams engaged in travel on behalf of Palo Alto between shopping centers owned by the corporation in the City of Palo Alto, San Jose, and Mill Valley, California. Gas, oil, parking, and tolls were paid by Williams most of the time in cash. Williams kept daily a running total of the amounts he expended in cash each month allegedly on behalf of Palo Alto for lunches and dinners and for daily travel. At the end *91 of each month, he would submit to Palo Alto's 31 treasurer his running total of such out-of-pocket expenditures for the month and would be reimbursed by Palo Alto for them.
A membership in the Palo Alto Hills Golf & Country Club was acquired by Palo Alto and carried as an asset on its books. Williams used this club about once or twice a year. During the period from 1963 through 1967 he played golf there a total of six to eight times with officers of Wells Fargo Bank with whom Palo Alto was doing financing. The club was used as a meeting place for discussions with the bank officers. Other employees of Palo Alto, including its treasurer, took people to the club for lunch or dinner during the period involved. Williams was a member of the Los Altos Golf & Country Club during the period from May 1, 1962 through April 30, 1968. He used the club for his personal and business purposes. Palo Alto paid the bill rendered by this club two out of every three months, and Williams personally paid the bills rendered for the third month. Palo Alto's use of the club was for business lunches with tenants, prospective tenants, and customers. Lunch costs were under $25 on each occasion. 32 During *92 the years from 1963 to 1967, Williams had extensive investments in Palm Springs and Palm Desert, California. These investments ranged in value from $500,000 to $1,000,000, and involved real estate development property, income property, ranch property, citrus property and vineyards. Some of the investments were owned through the sole proprietorship of Williams Bros. Others were owned by West El Dorado, Inc., of which Williams was president and 50 percent stockholder. Williams traveled to Palm Springs and Palm Desert about 10 or 12 times a year. Most of these trips were overnight. While there he incurred expenses at the El Dorado Country Club for business lunches and dinners in connection with his investment and income properties. Williams personally paid one-half of his total expenses on trips to the desert; while the other one-half was paid by his sole proprietorship, Williams Bros. Co.
Williams also maintained other business operations and investments through his sole proprietorship known as Williams & Co. Through this proprietorship he had an interest in the profits earned by the shopping centers operated by Palo Alto in the City of Palo Alto and in San Jose. Williams incurred *93 daily out-of-pocket 33 expenses allegedly on behalf of his sole proprietorships for local travel and for business lunches and dinners. He kept daily running totals of his cash expenditures, which were submitted each month to the chief disbursing officer of the proprietorships who would reimburse him for such amounts from the proprietorships' funds. Palo Alto made payments for the fiscal years ending April 30, 1963 through April 30, 1968, which it deducted as travel, entertainment and promotional expenses as follows: Fiscal Year Ending
Payee
$0
4-30-63
Ronald H. Williams
$3,450.75
Los Altos Golf & Country Club
670.03
Hyatt House & Stickney's
268.60
4-30-64
Ronald H. Williams
3,196.50
Los Altos Golf & Country Club
1,115.98
4-30-65
Ronald H. Williams
4,146.00
Los Altos and Palo Alto Golf & Country Clubs
1,093.59
Stickney's and Stockman's Motor Hotel
295.61
4-30-66
Ronald H. Williams
4,107.50
Los Altos and Palo Alto Golf & Country Clubs
1,374.66
4-30-67
Ronald H. Williams
3,475.75
Los Altos and Palo Alto Golf & Country Clubs
1,796.17
Stickney's
131.79
4-30-68
Ronald H. Williams
4,948.56
Los Altos and Palo Alto Golf & Country Clubs
1,721.77
Other
395.93 Respondent disallowed a portion of the aforementioned expenses claimed *94 by Palo Alto and determined that a certain portion of the travel, promotion and entertainment expenses claimed by Palo Alto were income to Williams. The earnings and profits of Palo Alto were sufficient for all material periods of time to cover the amounts determined as income to Williams and his wife as constructive dividends. For the calendar years 1963, 1964 and 1965, Williams and his wife claimed the following amounts as travel and entertainment expenses which were disallowed by respondent. Year
$0
1963
$7,653.73
1964
5,078.85
1965
5,979.47
OPINION The expenses involved are payments by Palo Alto and Williams' individual proprietorships (Williams Bros. Co., Williams & Co., and Macy & Co.) to Williams, the three country clubs (Los Altos, Palo Alto and El Dorado) and some other miscellaneous entertainment expenses, including payments to Hyatt House, Stickney's and the Stockman's Motor Hotel. The primary issue with respect to such payments is whether their business purpose was sufficiently substantiated by Palo Alto and Williams, 35 hereinafter called petitioners, to meet the requirements of sections 162 and 274 of the 1954 Code, although a small portion of the expenses do not involve *95 section 274 either because they were incurred before the effective date of that section [7] or because they were not the type of expense covered by it. There is no dispute raised as to their actual payment. The deductibility of the various expenses involved herein is essentially a question of fact, Commissioner v. Heininger, 320 U.S. 467 (1943), and the burden of proof is on petitioners. Respondent contends that regardless of whether petitioners' travel, entertainment and promotional expenditures constituted ordinary and necessary business expenses deductible under section 162, supra, petitioners failed to substantiate these expenses by "adequate records" or "other sufficient evidence" and that these expenses must, therefore, be disallowed pursuant to section 274(d) and the correlative regulations. We agree with respondent. 36 Section 162(a), supra, provides that a taxpayer may deduct the ordinary *96 and necessary expenses paid during the taxable year. Section 274(d) provides that travel, entertainment and gift expenses are not allowable as deductions unless the taxpayer substantiates, either by adequate records or by other sufficient evidence corroborating his own statement, the essential elements pertaining to the nature and business purpose of the involved travel, entertainment, or gift items. [8] *97 The terms "adequate" and "sufficient," as used in section 274(d), are vague and require clarification. The respondent, pursuant to legislative authorization contained in section 274(h), [9] has promulgated regulations which clarify the meaning of "adequate" and "sufficient" for purposes of the substantiation standards of section 274(d). See section 1.274-5(c), Income Tax Regs.[10] *98 *99 *100 *101 In this context, 38 section 1.274-5(c) (2), Income Tax Regs., provides that a diary account book or other similar record in which the taxpayer records the elements of each travel, entertainment, or gift expenditure contemporaneously with the specific expenditure satisfies the adequate records requirements of section 274(d). This regulation further 39 provides that entries in a contemporaneous diary or account book of $25 or less do not *102 require additional documentary evidence for purposes of section 274(d). See section 1.274-5(c) (2) (iii) (b), Income Tax Regs. 40 In the instant case Williams testified that he kept a running total ("dollar figure") of his expenses and was reimbursed for such out-of-pocket expenditures every month by Palo Alto and the individual proprietorships. The regulations provide generally that an employee need not report on his tax return reimbursements received for business expenses incurred by him for the benefit of his employer if he is required to and does make an "adequate accounting" to his employer of these expenses. Section 1.274-5(e) (2), Income Tax Regs. An employee who makes an "adequate accounting" to his employer usually will not again be required to substantiate such information. 41 Section 1.274-5(e) (5), Income Tax Regs. However, an employee who owns more than 10 percent of the stock of the corporation by which he is employed is required to personally substantiate expenses incurred on behalf of his employer. Section 1.274-5(e) (5) (ii), Income Tax Regs.
During the years involved Williams and his wife owned 100 percent of the stock of Palo Alto. No records were produced with *103 regard to the amounts Williams received from Palo Alto or his individual proprietorships. Consequently, Williams has failed to comply with any of the above regulations. We recognize that section 1.274-5(c) (3), Income Tax Regs., provides that in the absence of "adequate records" a taxpayer may alternatively satisfy the substantiation requirements of section 274(d) by introducing corroborative evidence sufficient to support his own detailed statements as to each element of the expenditure that was not substantiated by adequate records. This regulation further provides that where the unsubstantiated element is the cost, time, place or date of the expenditure, "the corroborative evidence shall be direct evidence, such as a statement in writing or the oral testimony of persons entertained or other witness setting forth detailed information about such element." 42 Petitioners have also failed to satisfy the "sufficient corroborative evidence" requirement of section 1.274-5(c) (3), Income Tax Regs. Williams was unable to testify to the elements of any particular expenditure and the testimony of Brantley C. McCullough, secretary-treasurer of Palo Alto was only informative of the way in which *104 petitioners kept track of their expenditures. Since the manner in which petitioners kept their records is wholly insufficient under section 274 and section 1.274-5, Income Tax Regs., McCullough's testimony adds nothing to Williams' testimony. Likewise, we find the testimony of Roy E. Sebrell, executive assistant to Williams, that he attended lunches with Williams on many occasions and that Williams usually paid cash for the meals is not sufficient evidence to satisfy the four elements of proof required by section 1.274-5(c) (3), Income Tax Regs.
We reject petitioners' contention that the substantiation requirements of section 274(d) with respect to the traveling expenses in question are not applicable because the daily travel involved in the cash disbursements was for local travel and not 43 incurred "while away from home" since it was all in the San Francisco Bay Area and did not involve overnight travel. It is sufficient to say that the record-keeping requirements of existing law continues to apply to expenses for local travel, and petitioners have failed to meet the substantiation requirement. See Rev. Proc. 63-4, 1963-1 C.B. 474. Also, we find no merit in petitioners' argument *105 that the requirements of section 274 are not applicable to the business meals portion of the cash disbursements because the meals involved fall within the broad definition of business meals as defined in section 1.274-2(f) (2) (i), Income Tax Regs., and therefore should be excluded from the requirements of section 274. In general, section 274 as a whole provides for the disallowance of certain types of deductions, whereas subsection (d), involved herein spells out the substantiation requirements which must be met where the deduction is otherwise allowable. Subsection (e) lists certain exceptions to section (a), which deals with the disallowance of specified entertainment, amusement or recreation deductions, and one of those exceptions is found in paragraph (1) of subsection (e) dealing with 44 "business meals." Thus, (e) (1) makes clear that subsection (a) may not be relied upon to disallow deductions for "business meals" that qualify under (e) (1). We also note that section 1.274-2(f), Income Tax Regs., (dealing with specific exceptions to the application of section 274) under subparagraph (2) (i) relating to "business meals" states that expenditures described in section 1.274-2(f) *106 "are subject to the substantiation requirements of section 274(d) to the extent required in section 1.274-5, Income Tax Regs." The committee reports make it clear that even though an expenditure is covered by one of the exceptions to (a), the "substantiation requirements" must nevertheless "be fulfilled": H. Rept. No. 1447, 87th Cong., 2d Sess., p. A33. See also S. Rept. No. 1881, 87th Cong., 2d Sess., p. 36 ("the new substantiation requirements * * * will have to be satisfied with respect to any such expense"). The same thought is expressed in section 1.274-5(a) (2), Income Tax Regs., which explicitly states that the substantiation requirements must be met in connection with any expense for entertainment, amusement, or recreation "including the items specified in section 274(e)," and as 45 mentioned hereinabove section 274(e) includes "business meals" which are subject to the substantiation requirements of section 274(d). As noted hereinabove section 274(e) includes "business meals" and under section 1.274-2(f) (2) (i), Income Tax Regs., "business meals and similar expenditures" are explicitly subject to the substantiation requirements of section 274(d). Consequently, there is *107 no merit in petitioners' contention based on section 1.274-2(f) (2) (i), Income Tax Regs. See Robert H. Alter, supra, 833. The entertainment expenses paid directly to the country clubs by Palo Alto and the proprietorships must also meet the requirements of the regulations as to the date and duration of each business discussion, the place, the business purpose and the business relationship with the persons entertained. Section 1.274-5(b) (4), Income Tax Regs. While Williams has attempted to meet this requirement by statements indicating the general atmosphere of the clubs, he has been unable to demonstrate that any specific expenditure was directly related to his business. Williams' testimony was to the effect that prospective customers were entertained at the clubs, but he was 46 unable to furnish information any more specific than what his general practice was with regard to this type of entertainment. Some of the payments by Palo Alto for the fiscal year ending April 30, 1963, are not subject to the requirements of section 274 since they were incurred in 1962. Section 1.274-8, Income Tax Regs. Nevertheless, for these expenses Palo Alto must establish that they were ordinary and *108 necessary under section 162, supra. During the years in question the bills for the expenses under review were sent to McCullough, the secretary-treasurer of Palo Alto, who paid them. With regard to the payments made to Williams and the Los Altos Country Club in 1962, McCullough was able to testify only as to the general nature of the expenses. The $325 check written in July 1967, for cash, which petitioners apparently claim is a gift to charity, was disallowed under section 162 since the petitioners made no attempt to substantiate what the item was for. Presumably this should have been claimed in Schedule 1 of Palo Alto's tax return for the fiscal year ending April 30, 1968. 47
Petitioners, relying on LaForge v. Commissioner, 434 F.2d 370 (C.A. 2, 1970), reversing in part and affirming in part 53 T.C. 41 (1969), contend that the oral testimony of Williams and McCullough is, per se, sufficient to cure the substantiation defects inherent in the records introduced in the instant proceeding. Petitioners' reliance of LaForge is misplaced. In that case the taxpayer, a physician, claimed deductions for business luncheons which he purchased at a hospital cafeteria for residents and *109 interns who assisted him in his hospital rounds. The hospital's cashier gave testimony at trial which substantiated the taxpayer's contentions. In partially reversing the Tax Court's decision, the Second Circuit held that, although the taxpayer did not maintain adequate records of his luncheon entertainment expenses, the taxpayer's testimony estimating the amount of these expenses, in conjunction with the cashier's testimony, was sufficient to substantiate the deduction. Accordingly, under the rationale of LaForge, a taxpayer's oral testimony, when supported by "other corroborative evidence," is sufficient to satisfy section 274(d)'s substantiation 48 requirements. See Norman E. Kennelly, 56 T.C. 936 (1971), affirmed 456 F.2d 1335 (C.A. 2, 1972); see also the current version of section 1.274-5(c) (3), Income Tax Regs., which reflects the influence of the Second Circuit's decision in LaForge. Contrary to the facts in LaForge, petitioners in the instant case have failed to provide the requisite "other corroborative evidence" to support their claimed travel and entertainment expenses for the taxable years involved. Thus, under LaForge, petitioners' claim for these expenses was *110 properly disallowed. Accordingly, since petitioners have not complied with the substantiation requirements of section 274(d), we hold that petitioners are not entitled to the deductions for the travel, entertainment and promotional expenses purportedly incurred during the taxable years involved which respondent disallowed. See William F. Sanford, supra, 832-833 and Robert H. Alter, supra, 836. The respondent determined that a certain portion of the travel, entertainment and promotional expenses claimed by Palo Alto were income to Williams.Williams, in opposition, contends that the money he received from Palo Alto as a stockholder-employee was primarily for the benefit of the corporation and therefore should not 49 be treated as additional income to him during the years of receipt. To the extent that Williams has failed to substantiate that the money he received from Palo Alto was a reimbursement for business expenses, discussed hereinabove, we hold that he has received a constructive dividend which is taxable to him to the extent he has received a personal benefit from these payments. United States v. Gotcher, 401 F.2d 118, 123 (C.A. 5, 1968). It has been stipulated that Palo *111 Alto had sufficient earnings and profits to cover these amounts as dividends. In John L. Ashby, 50 T.C. 409 (1968), the taxpayer owned 98 percent of a corporation. The corporation deducted certain entertainment expenses in connection with a yacht it owned but which was used primarily by the taxpayer. In disallowing the entertainment deductions to the corporation, as well as deductions claimed by the corporation for the expenses of the boat, the Court held that these payments constituted dividends to the taxpayer. The Court said (p. 417): It is well established that any expenditure made by a corporation for the personal benefit of its stockholders or the making available or corporate-owned facilities to stockholders for their personal benefit may result in the receipt by the stockholders of constructive dividends. * * * See also: Challenge Manufacturing Co., 37 T.C. 650, at 663 (1962). We are convinced that the expenses in controversy were paid by the company primarily for the personal benefit of Ronald H. Williams, its president, and as such constitute constructive dividend income to him during the fiscal years ending April 30, 1963 through April 30, 1968 in the amounts determined *112 by the respondent. American Properties, Inc., 28 T.C. 1100 (1957), affirmed per curiam 262 F.2d 150 (C.A. 9, 1958); and William K. Coors, 60 T.C. 368 (1973). Decision will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: TOWN & COUNTRY CONSTRUCTION CO., INC., docket No. 5948-70; RONALD H. WILLIAMS and ANN G. WILLIAMS, docket No. 5949-70. ↩
2. Though the agreement states that Palo Alto is the buyer, it has been stipulated that Williams and his wife were in fact the buyers. ↩
3. In his opening statement, counsel for respondent agreed that the correct cost figure per acre under the respondent's theory was $616,414.06 divided by 41.782 acres, or $14,753.10 per acre, rather than the figure of $14,377.66 used in the notice of deficiency. ↩
4. In Seas Shipping Company v. Commissioner, 371 F.2d 528↩ (C.A. 2, 1967), where the Court was confronted with a similar basis issue, the Court said: "Where parties with adverse interests are at issue over worth of property, and then agree upon dollar amount of that worth, agreement is very persuasive evidence of value." 5. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses. ↩
6. The parties have agreed that the correct amount is $29,948.99 which is $846.66 less than that set forth in the notice of deficiency. ↩
7. The effective date of section 274 was January 1, 1963. However, in Rev. Rul. 63-144, 1963-2 C.B. 129↩, 130 (Question 3), the respondent ruled that the new rules would not be applied until after July 31, 1963 if a good faith effort was made to comply with the new substantive requirements. 8. Sec. 274(d) provides as follows: (d) SUBSTANTIATION REQUIRED. - No deduction shall be allowed - (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or (3) for any expense for gifts, unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations. 9. (h) REGULATORY AUTHORITY. - The Secretary or his delegate shall prescribe such regulations as he may deem necessary to carry out the purposes of this section, including regulations prescribing whether subsection (a) or subsection (b) applies in cases where both such subsections would otherwise apply. ↩
10. Sec. 1.274-5(c) (2). Substantiation by adequate records - (i) In general. To meet the "adequate records" requirements of section 274(d), a taxpayer shall maintain an account book, diary, statement of expense or similar records (as provided in subdivision (ii) of this subparagraph) and documentary evidence (as provided in subdivision (iii) of this subparagraph) which, in combination, are sufficient to establish each element of an expenditure specified in paragraph (b) of this section. It is not necessary to record information in an account book, diary, statement of expense or similar record which duplicates information reflected on a receipt so long as such account book and receipt complement each other in an orderly manner. (ii) Account book, diary, etc. An account book, diary, statement of expense or similar record must be prepared or maintained in such manner that each recording of an element of an expenditure is made at or near the time of the expenditure. (a) Made at or near the time of the expenditure. For purposes of this section, the phrase "made at or near the time of the expenditure" means the elements of an expenditure are recorded at a time when, in relation to the making of an expenditure, the taxpayer has full present knowledge of each element of the expenditure, such as the amount, time, place and business purpose of the expenditure and business relationship to the taxpayer of any person entertained. An expense account statement which is a transcription of an account book, diary, or similar record prepared or maintained in accordance with the provisions of this subdivision shall be considered a record prepared or maintained in the manner prescribed in the preceding sentence if such expense account statement is submitted by an employee to his employer or by an independent contractor to his client or customer in the regular course of good business practice. (b) Substantiation of business purpose. In order to constitute an adequate record of business purpose within the meaning of section 274(d) and this subparagraph, a written statement of business purpose generally is required. However, the degree of substantiation necessary to establish business purpose will vary depending upon the facts and circumstances of each case. Where the business purpose of an expenditure is evident from the surrounding facts and circumstances, a written explanation of such business purpose will not be required. * * * (c) Confidential information. * * * (iii) Documentary evidence. Documentary evidence, such as receipts, paid bills, or similar evidence sufficient to support an expenditure shall be required for - (a) Any expenditure for lodging while traveling away from home, and (b) Any other expenditure of $25 or more, except, for transportation charges, documentary evidence will not be required if not readily available, provided, however, that the Commissioner, in his discretion, may prescribe rules waiving such requirements in circumstances where he determines it is impracticable for such documentary evidence to be required. Ordinarily, documentary evidence will be considered adequate to support an expenditure if it includes sufficient information to establish the amount, date, place, and the essential character of the expenditure. * * * (iv) Retention of documentary evidence. * * * (v) Substantial compliance. * * * (3) Substantiation by other sufficient evidence. If a taxpayer fails to establish to the satisfaction of the district director that he has substantially complied with the "adequate records" requirements of subparagraph (2) of this paragraph with respect to an element of an expenditure, then, except as otherwise provided in this paragraph, the taxpayer must establish such element - (i) By his own statement in writing containing specific information in detail as to such element; and (ii) By other corroborative evidence sufficient to establish such element. If such element is the description of a gift, or the cost, time, place, or date of an expenditure, the corroborative evidence shall be direct evidence, such as a statement in writing or the oral testimony of persons entertained or other witness setting forth detailed information about such element, or the documentary evidence described in subparagraph (2) of this paragraph. If such element is either the business relationship to the taxpayer of persons entertained or the business purposes of an expenditure, the corroborative evidence may be circumstantial evidence. * * * ↩